UNITED STATES DISTRICT COURT
FOR THE
WESTERN DISTRICT OF NEW YORK

SABY GEORGE, M.D.,                               )
                                                 )
    Plaintiff,                                   )
                                                 )
    v.                                           )       Case No. 1:22-cv-1006
                                                 )
ROSWELL PARK CANCER INSTITUTE                    )
CORPORATION, d/b/a ROSWELL PARK                  )
COMPREHENSIVE CANCER CENTER                      )
and GURKAMAL SIGH CHATTA, M.D.,                  )
                                                 )
    Defendants.                                  )

## OPINION AND ORDER ON MOTION TO DISMISS
### (Doc. 6)

Plaintiff Saby George, M.D., brings this discrimination case against his employer,

Roswell Park Cancer Institute Corporation, d/b/a Roswell Park Comprehensive Cancer Center

("Roswell") and against Gurkamal Singh Chatta, M.D., who was Dr. George's direct supervisor

at Roswell at relevant times before November 2019 and again after November 2020.  The causes

of action against Roswell in the original Complaint (Doc. 1) are: discrimination based on race,

color, and national origin under Title VII and the New York State Human Rights Law

("NYSHRL") (Counts 1–2); discrimination based on religion under Title VII and the NYSHRL

(Counts 3–4); retaliation under Title VII and the NYSHRL (Counts 5–6); and discrimination and

retaliation based on race under 42 U.S.C. § 1981 (Count 8).  The Complaint also includes a count

against Dr. Chatta alleging individual liability under the NYSHRL (Count 7).  The Amended

Complaint—filed on February 14, 2023—adds a claim (Count 9) against both defendants for

discrimination and retaliation in violation of Buffalo Administrative Code § 154-11.

(*See* Doc. 8.)

Defendants filed a motion to dismiss the Complaint in January 2023.  (Doc. 6.)  Plaintiff

filed an opposition in February 2023 (Doc. 9) and simultaneously filed an Amended Complaint

(Doc. 8).  Defendants filed a reply (Doc. 12), and the parties have both filed sur-replies

(Docs. 15, 16.)  The court heard argument on the motion on July 28, 2025.

## Background

The Amended Complaint alleges as follows.  Plaintiff Saby George describes his race as

Dravidian; he is dark-skinned, his national origin is southern Indian, and he is a Christian.

(Doc. 8 ¶ 15.)  He started his first job as Assistant Professor of Medicine at Roswell Park Cancer

Institute in August 2010.  (*Id.* ¶ 16.)  According to the Amended Complaint, Dr. George

performed his duties at Roswell in a more than satisfactory manner at all times.  (*Id.* ¶ 17.)

In 2014–2015, there was a "crisis" at Roswell's Department of Medicine, which was at

that time under the leadership of Dr. Alex Adjei.  (*Id.* ¶ 18.)  Nearly a third of the faculty left the

institute suddenly.  (*Id.* ¶ 19.)  Although everyone else in the Department of Medicine received a

$25,000 productivity bonus, Dr. Adjei denied that benefit to Dr. George.  (*Id.* ¶ 20.)  Dr. George

was about to leave employment at Roswell, but Roswell's President and CEO, Dr. Candace

Johnson, persuaded him to stay, advising him that he was one of the department's best doctors

and offering him a retention bonus and a raise.  (*Id.* ¶¶ 21–22.)

Dr. Adjei left in March 2016 and conditions improved when Dr. Marc Ernstoff became

the new Chair of the Department of Medicine.  (*Id.* ¶ 25.)  Dr. George found Dr. Ernstoff to be a

fair chairperson.  (*Id.* ¶ 26.)  Dr. Ernstoff "built the Department back into a strong one."  (*Id.*)

Dr. Gurkamal Singh Chatta started at Roswell in January 2016 and became Dr. George's

supervisor.  (*Id.* ¶ 23.)  Dr. Chatta has lighter skin, is of north Indian origin, and is Hindu/Sikh.

(*Id.* ¶ 24.)  Dr. Chatta "[made] Plaintiff's life difficult" at all relevant times.  (*Id.* ¶ 27.)

2

Dr. Chatta attempted "to create roadblocks for Plaintiff's outside consulting opportunities." (*Id.* ¶ 31.) Dr. Ernstoff and Ethics Committee Chair Dr. Camille Wicher ultimately overturned Dr. Chatta's disapproval of the outside consulting opportunities. (*Id.* ¶ 32.) Dr. Chatta attempted, unsuccessfully, to remove Dr. George from his Principal Investigator role in many clinical trials. (*Id.* ¶ 33.) Dr. Chatta also used his subordinates to make Dr. George's life difficult in the clinic. (*Id.* ¶ 34.) For example, Dr. Chatta had clinic administrator Karen Sniadecki provide "inaccurate/fabricated information about Plaintiff's clinical productivity and pressure him to work in the clinics more than required." (*Id.* ¶ 35.) As another example, Dr. Chatta provided Dr. George with inadequate nurse practitioner support when Dr. George's clinic was short on staff. (*Id.* ¶ 36.)

Dr. Chatta also used tactics to reduce the flow of patients to Dr. George's clinic. (*Id.* ¶ 38.) Dr. Chatta worked closely with the urology department chair to reroute referral patients away from Dr. George's clinic. (*Id.* ¶¶ 38–39.) Dr. George was able to keep his volume up by compensating with direct patient referrals from outside physicians. (*Id.* ¶ 40.)

Dr. Chatta also obstructed Dr. George's professional growth at Roswell. (*Id.* ¶ 41.) Although Dr. George became an Associate Professor in 2016, his salary was not raised to the Associate Professor level until the end of 2019. (*Id.* ¶ 42.) Dr. George had been asking for a raise since 2016, but Dr. Chatta blocked it on the ground that Dr. Johnson gave Dr. George a bonus in 2015. (*Id.* ¶ 43.) Dr. George does not dispute that Dr. Johnson gave him a bonus in 2015, but he asserts that it was a "retention bonus and not a productivity bonus or a raise consistent with his rank." (*Id.* ¶ 44.) Dr. George contacted Dr. Ernstoff about the pay issue in 2019. (*Id.* ¶ 46.) "Dr. Ernstoff realized that Plaintiff had been underpaid for a long time and he

immediately gave Plaintiff a bonus and a salary raise to Associate Professor level in late 2019."
(*Id.* ¶ 47.)

Dr. George complained to Dr. Ernstoff many times about Dr. Chatta's "discriminatory
treatment and harassment." (*Id.* ¶ 48.) "Dr. Ernstoff had Plaintiff engage in meetings with
Chatta on several occasions, however, Chatta never stopped harassing Plaintiff." (*Id.* ¶ 49.) Dr.
Ernstoff asked Dr. George to complain to Human Resources ("HR") and Dr. George made a
complaint in 2017, asserting that he was facing ethnic-type discrimination from Dr. Chatta and
that Chatta and his subordinates made the workplace toxic. (*Id.* ¶¶ 51–53.) Dr. George alleges
on information and belief that HR failed to investigate his complaint (at least initially). (*See id.*
¶ 50.)

In or around June 2018, Dr. George notified Susan Johnson, Roswell's Director of
Employee & Labor Relations, that Dr. Chatta was discriminating against him because of his
"ethnic origin." (*Id.* ¶ 28.) Ms. Johnson did not respond to those allegations. (*Id.* ¶ 29.) On or
about October 17, 2018, Dr. George emailed Ms. Johnson to inform her again of the ongoing
discrimination. (*Id.* ¶ 30.) Eventually, after "nearly two years"[1] HR completed an investigation
and "found that Plaintiff's complaints were valid." (*Id.* ¶ 55.)

For a period of time before HR completed its investigation, Dr. George was being
considered for a Medical Director position in Clinical Research Services ("CRS"). (*Id.* ¶ 58.)
That was a non-union position, and Dr. George was uncomfortable leaving the Public Employees
Federation Union with an unresolved investigation. (*Id.* ¶ 59.) Dr. Johnson offered Dr. George a
Director of CRS position in August 2019. (*Id.* ¶ 60.) At a meeting on October 25, 2019, it was

---

[1] Presumably from the time Dr. George first complained to Human Resources in 2017.
Before that, Dr. George alleges that HR performed "no investigation" despite his numerous
complaints to Dr. Ernstoff. (*See id.* ¶¶ 48, 50.)

announced that Dr. George was the new Medical Director of CRS. (*Id.* ¶ 65.) The contract for the CRS Director position was being finalized by early November 2019. (*Id.* ¶ 61.)

On November 18, 2019, as a result of the HR investigation substantiating Dr. George's complaints against Dr. Chatta, Dr. George's reporting was changed to Dr. Ernstoff directly, instead of Dr. Chatta. (*See id.* ¶¶ 55, 56, 62.) Two days later, Dr. Johnson called Dr. George to her office and rescinded the CRS Director offer. (*Id.* ¶ 62.) When Dr. George asked Dr. Johnson why she was rescinding the offer, Dr. Johnson mentioned, "You know, people talk." (*Id.* ¶ 63.) Dr. George had already started working in the capacity of CRS Medical Director at that time. (*Id.* ¶ 64.) Having the offer rescinded was humiliating for Dr. George, especially because his coworkers knew that the medical director title was offered and then taken away. (*Id.* ¶ 66.)

With support from Dr. Ernstoff and other international leaders in the field, Dr. George was promoted to full professor in November 2020. (*Id.* ¶¶ 70–71.) That promotion came shortly after Dr. Ernstoff left Roswell in September 2020 and Dr. Chatta became Interim Chair of Medicine. (*Id.* ¶¶ 69, 78.) With Dr. Ernstoff's departure, Dr. George was once again placed under Dr. Chatta's supervision. (*See id.* ¶ 72.)

Dr. Chatta restarted his "harassing, discriminatory, and retaliatory treatment." (*Id.* ¶ 73.) On an occasion in November 2020, Dr. George was talking with Dr. Chatta and two nurses and mentioned that his vitamin D levels were low since moving to Buffalo. (*Id.* ¶¶ 74–75.) Dr. Chatta remarked: "[Y]ou people from South India are dark-skinned and you should not have low Vitamin-D levels." (*Id.* ¶ 76.)

Also in November 2020, Dr. George took on a leadership role under Dr. Igor Puzanov, who became the new Senior Vice President for clinical research. (*Id.* ¶ 77.) Dr. Chatta and the Department increased Dr. George's clinical workload from 40% to 50%, which impacted Dr.

George's "relative value unit ('RVU')," made it more difficult for him to meet his goals, and impacted his bonus. (*Id.* ¶¶ 78–79.) Dr. George asserts that the increased clinical expectations also impacted his ability to perform research. (*Id.* ¶ 80.)[2]

Dr. George requested that Dr. Chatta reduce his clinical effort percentage down to 30% or 40%. (*Id.* ¶ 78.) Dr. Chatta refused that request "without explanation." (*Id.* ¶ 81.) At the annual meeting on February 26, 2021, Dr. George was told that he should work with Dr. Puzanov to get the reduction. (*Id.* ¶ 82.) In contrast, Dr. George discovered that Dr. Chatta had reduced Dr. Dharmesh Gopalakrishnan's clinical effort to 40%, despite Roswell's longstanding practice that all new faculty members start at 50%. (*Id.* ¶ 83.) Dr. Gopalakrishnan was at that time a new and less experienced doctor. (*Id.*) He is light-skinned and of Indian descent and of the Hindu religion. (*Id.*)

In spring 2021, Dr. Chatta "directly interfered with Plaintiff becoming a new clinical trial Principal Investigator (PI)." (*Id.* ¶ 84.) On April 5, 2021, Dr. George received in inquiry about his potential appointment as the PI for the ARV-766-mCRPC-101 prostate study. (*Id.* ¶ 85.) Dr. George forwarded that information to Dr. Chatta for approval, but Dr. Chatta denied Dr. George's request to become the PI, stating that "all advanced Prostate studies need to go through me." (*Id.* ¶ 86.) Dr. George advised Dr. Chatta that he was specifically asked to do the study

---

[2] Paragraph 80 includes an additional assertion that Roswell has used "lack of research progress . . . against other physicians in their evaluations." Footnote 1 of ¶ 80 cites multiple other lawsuits in support of the contention that Roswell "has a long, sordid, and documented history of retaliation against doctors and other employees for having the gall to raise complaints of discrimination." Defendants seek to strike ¶ 80 and footnote 1 of the Amended Complaint under Fed. R. Civ. P. 12(f) as unrelated to Plaintiff or any of Plaintiff's claims. (Doc. 12 at 7.) Plaintiff opposes that request. (Doc. 15 at 3–4.) The court does not rely on the other lawsuits to reach its conclusions here; Defendants' request to strike is therefore denied as moot. *Cf. White v. CSX Transp., Inc.*, No. 19-CV-500, 2023 WL 7166523, at *3 (W.D.N.Y. Oct. 31, 2023) (denying requests to strike as moot where the court did not rely on the challenged materials).

based on a personal connection and because of his prominence in the field of genitourinary oncology. (*Id.* ¶ 87.) Dr. George further noted that he was the PI in several prostate studies within the past decade. (*Id.* ¶ 88.) Dr. Chatta nonetheless designated himself as the PI, claiming, falsely, that all prostate cancer trials had been going through him and all kidney cancer trials had been going through Dr. George since 2016. (*Id.* ¶¶ 89–90.) The lost opportunity to be PI "tarnished Dr. George's reputation and caused him to lose the opportunity to oversee the clinical results and publish the results, which also negatively affected his standing and goals at Roswell." (*Id.* ¶ 91.) The lost research opportunity also negatively impacted Dr. George's performance appraisal and bonuses. (*Id.* ¶ 92.)

On March 8, 2021, Roswell's Diversity Officer David Scott informed Dr. George that there were three anonymous complaints against him. (*Id.* ¶ 93.) Dr. George met with Mr. Scott and with Diane Morgante from Mr. Scott's office and learned that two of the complaints were from people who worked with him and one of the complaints was from a person who did not work with him. (*Id.* ¶ 94.) Later, Mr. Scott advised Dr. George that the complaints were not going to be pursued. (*Id.* ¶ 95.) Nevertheless, the situation caused Dr. George "a good deal of distress." (*Id.* ¶ 96.) He had worked at Roswell without any issue for many years before the anonymous complaints. (*Id.* ¶ 107.)

On April 21, 2021, Dr. Hohn advised Dr. George that Dr. Chatta had referred a complaint about Dr. George to HR. (*Id.* ¶ 97.) HR then informed Dr. George that an additional anonymous complaint had been made against him. (*Id.* ¶ 98.) Employee & Labor Relations Manager Brian Horsmon interviewed Dr. George in connection with an investigation of that complaint. (*Id.* ¶ 99.) Mr. Horsmon advised that he could not divulge the actual complaint because it had to remain confidential. (*Id.* ¶ 100.) According to Dr. George, that made it "nearly impossible" for

him to adequately respond to the complaint. (*Id.* ¶ 101.) During the interview, Dr. George advised Mr. Horsmon that three Caucasian nurse coordinators and one Caucasian nurse practitioner had harassed Shirley Crawley, an African American nurse practitioner. (*Id.* ¶ 102.) As a result of the harassment, Ms. Crawley left Roswell after only a few months of working there. (*Id.* ¶ 103.)

Dr. George had another "administrative interrogation" with Mr. Horsmon on June 3, 2021. (*Id.* ¶ 104.) When Dr. George asked about the discrimination issue with Ms. Crawley, Mr. Horsmon told him they were not investigating it. (*Id.* ¶ 105.) Dr. George asserts that he also learned at the June 2021 meeting that the four anonymous complaints against him were "false." (*See id.* ¶ 106.) Still, Dr. George was presented with a letter of reprimand dated June 23, 2021, and signed by Mr. Horsmon. (*Id.* ¶ 108.) The letter stated that "any further incidents of the same/similar nature as addressed in the June 3, 2021, Administrative Interrogation will lead to additional disciplinary action." (*Id.* ¶ 109.)

In late March 2022, Dr. George requested approval for an outside activity ("OA") application to work with the company Sanofi/Genzyme. Approval was "normally a purely ministerial action." (*Id.* ¶ 110.) Dr. Chatta "ignored" the request until it was overdue. (*Id.* ¶ 111.) Then, on April 11, 2022, Dr. Chatta forwarded the request to Vivian Scoma, asking her to forward it to Dr. Brentjens. (*Id.*) All of this delayed and jeopardized Dr. George's OA application. (*Id.* ¶ 112.)

On June 27, 2022, after another employee made a remark about the sun, Dr. Chatta stated in Dr. George's direction that he (Dr. Chatta) had the "advantage of having skin pigment and Vitamin D." (*Id.* ¶ 113.) Dr. Chatta was laughing at Dr. George when he made that comment. (*Id.* ¶ 114.)

## Procedural History

Dr. George presented a Charge of Discrimination to the Equal Employment Opportunity Commission (EEOC) on or about July 21, 2021.  (*See* Doc. 8 ¶ 11; Doc. 6-2.)[3]  The EEOC issued Dr. George a Right to Sue Notice dated September 29, 2022.  (Doc. 8 ¶ 13.)  Dr. George filed his original Complaint in this court on December 22, 2022.  (Doc. 1.)

## Rule 12(b)(6) Standard

To survive a motion to dismiss, a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  The court must "accept as true all factual allegations and draw from them all reasonable inferences." *Hernandez v. United States*, 939 F.3d 191, 198 (2d Cir. 2019).  However, "[t]hreadbare recitals of elements of a cause of action, supported by mere conclusory statements, do not suffice." *Empire Merchants, LLC v. Reliable Churchill LLLP*, 902 F.3d 132, 139 (2d Cir. 2018) (quoting *Iqbal*, 556 U.S. at 570).  "Dismissal is appropriate when 'it is clear from the face of the complaint, and matters of which the court may take judicial notice, that the plaintiff's claims are barred as a matter of law.'" *Parkcentral Glob. Hub Ltd. v. Porsche Auto. Holdings SE*, 763 F.3d 198, 208–09 (2d Cir. 2014) (per curiam) (quoting *Conopco, Inc. v. Roll Int'l*, 231 F.3d 82, 86 (2d Cir. 2000)).  "Dismissal under Rule 12(b)(6) is appropriate when a defendant raises lack of timeliness as an affirmative defense and it is clear from the face of the complaint that the

---

[3] The date of the EEOC filing does not appear in the Amended Complaint, but Defendants assert that the court can properly review the document (and its date) as "integral" to the pleading, particularly because ¶ 11 of the Amended Complaint specifically refers to the charges that Dr. George filed with the EEOC.  (Doc. 6-3 at 9 n.1.)  The court agrees that the EEOC filing is integral to the Amended Complaint; it is also properly subject to judicial notice as a public document filed in administrative agency proceedings. *See, e.g.*, *Watkins v. Rochester Gen. Hosp.*, No. 13-CV-6386, 2014 WL 1224680, at *1 (W.D.N.Y. Mar. 25, 2014).

plaintiff's claims are barred as a matter of law." *Moreira v. Société Générale, S.A.*, 125 F.4th 371, 387 n.12 (2d Cir. 2025) (cleaned up; quoting *Sewell v. Bernadin*, 795 F.3d 337, 339 (2d Cir. 2015)).

**Analysis**

Defendants assert six categories of arguments for dismissal of the nine claims in the Amended Complaint.  The court considers each category in turn.

## I.     Timeliness of Title VII Claims (Counts 1, 3, 5)

"Under Title VII, plaintiffs must file a charge with the EEOC 'within 180 [days] or, in states like New York that have local administrative mechanisms for pursuing discrimination claims, 300 days "after the alleged unlawful employment practice occurred."'" *King v. Aramark Servs., Inc.*, 96 F.4th 546, 559 (2d Cir. 2024) (alteration in original; quoting *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 78–79 (2d Cir. 2015)).  Here, it is undisputed that Dr. George filed his EEOC charge on July 21, 2021.  (*See* Doc. 8 ¶ 11; Doc. 6-2.)  The 300-day "lookback" period from that date thus extends back to September 24, 2020—approximately the time that Dr. Ernstoff left Roswell and Dr. Chatta became interim chair and resumed direct supervision of Dr. George.

### A.     Discrete Acts and Hostile Work Environment Claim

In the context of Title VII claims and similar claims of employment discrimination, the phrase "unlawful employment practice" "generally refers to 'a discrete act or single "occurrence."'" *King*, 96 F.4th at 559 (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 111 (2002)).  "Examples of discrete acts include terminating employment, failing to promote, denying a transfer, and refusing to hire." *Id.*  "Because a discrete discriminatory act is individually actionable and 'occurs' on the day that it 'happened,' the 300-day limitations period

begins running on the day of each occurrence, meaning each discrete act claim carries its own 300-day limitations period." *Id.* (quoting *Morgan*, 536 U.S. at 110).

"[D]iscrete acts that fall within the statutory time period do not make timely acts that fall outside the time period." *Morgan*, 536 U.S. at 112 (discussing *United Air Lines, Inc. v. Evans*, 431 U.S. 553 (1977)). "[D]iscrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges." *Id.* at 113. Relying on these principles, Defendants assert that "[a]ll of Plaintiff's allegations are discrete acts that are neither discriminatory [n]or timely." (Doc. 6-3 at 9; *see also* Doc. 12 at 8 (asserting that "[a]lleged conduct that took place before September 24, 2020[,] is time-barred, without exception").)

The pleadings indicate that Dr. George alleges more than just a series of "discrete acts." He specifically asserts that the alleged discrimination "create[ed] a hostile work environment." (Doc. 8 ¶ 134; *see also id.* ¶ 53 (Dr. George complained to HR in 2017 that Dr. Chatta made the workplace "toxic").) And "[c]laims of discriminatory hostile work environment are subject to the continuing violation doctrine." *King*, 96 F.4th at 559. That doctrine creates an exception to the 300-day rule when "specific and related instances of discrimination are permitted by the employer to continue unremedied for so long as to amount to a discriminatory policy or practice". *Id.* (citing *Banks v. Gen. Motors, LLC*, 81 F.4th 242, 259 (2d Cir. 2023), and quoting *Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 713 (2d Cir. 1996)). Courts recognize that exception "because the 'very nature' of a hostile environment claim 'involves repeated conduct,' and 'incidents that give rise to a hostile work environment "occur over a series of days or perhaps years and a single act of harassment may not be actionable on its own."'" *Id.* at 559–60 (quoting *Banks*, 81 F.4th at 259–60).

In light of the above, the Second Circuit has held that, in Title VII cases, "[a] discrete discriminatory act, such as termination, within the limitations period may not only support a claim for damages, it may also render a hostile work environment claim timely *if it is shown to be part of the course of discriminatory conduct that underlies the hostile work environment claim*." *Id.* at 561. And a discrete act that is untimely for purposes of a separate discrete-act claim for damages "can nevertheless help a plaintiff prove a hostile environment claim." *Id.* The court is mindful that the above principles are subject to the limitation that "[t]he continuing violation doctrine allows a Title VII plaintiff to rely on a discrete act to render a hostile environment claim timely *only* if the plaintiff establishes that the discrete act was part of the ongoing, discriminatory practice that created a hostile work environment." *Id.*

Here, a variety of alleged events might be untimely for purposes of a separate "discrete act" claim. The alleged failure to pay Dr. George a salary commensurate with his rank as associate professor between 2016 and 2019 is a discrete act analogous to a failure to promote. *Cf. Kennedy v. Lease Fin. Grp.*, No. 04-C-5713, 2005 WL 3447760, at *7 (N.D. Ill. Dec. 13, 2005) (allegations that defendant failed to promote her and give her a pay raise commensurate with her education and experience were "discrete acts"). So, too, is the rescission of the offer to make Dr. George the CRS Medical Director. HR's failure to investigate or its two-year delay in completing an investigation is also a discrete act. *See Rogers v. Fashion Inst. of Tech.*, No. 14 Civ. 6420, 2016 WL 889590, at *4 n.5 (S.D.N.Y. Feb. 26, 2016) ("[A]n alleged failure to investigate is a discrete act." (citing *Bey v. I.B.E.W. Loc. Union No. 3*, No. 05 Civ. 7910, 2008 WL 821862, at *13 (S.D.N.Y. Mar. 26, 2008))). Other alleged conduct—such as having the clinic administrator provide inaccurate or fabricated information about Dr. George's productivity and failing to provide adequate nurse practitioner support—would likewise appear

to fit within the "discrete acts" category.  *See O'Connor v. City of Newark*, 440 F.3d 125, 126

n.1, 127 (3d Cir. 2006) (failure to provide adequate staff and resources and wrongful accusation

are "discrete acts").

But, as described in *King*, even if this pre-2020 alleged conduct is untimely for purposes

of a "discrete act" claim, it "can nevertheless help [Dr. George] prove a hostile environment

claim." *King*, 96 F.4th at 561.  As noted above, Dr. George has asserted such a claim.  (Doc. 8

¶ 134; *see also id.* ¶ 53 (Dr. George complained to HR in 2017 that Dr. Chatta made the

workplace "toxic").)  Defendants argue, however, that the allegations do not support a hostile-

work-environment claim.  (Doc. 6-3 at 15.)  The court considers that argument next.

## B.    Title VII Hostile Work Environment

To state a Title VII claim of discriminatory harassment based on a hostile work

environment, a plaintiff must allege: "(1) that [his] workplace was permeated with

discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of

[his] work environment, and (2) that a specific basis exists for imputing the conduct that created

the hostile environment to the employer." *Murray v. N.Y. Univ. Coll. of Dentistry*, 57 F.3d 243,

249 (2d Cir. 1995) (citations omitted).[4]  "This standard has both objective and subjective

components: the conduct complained of must be severe or pervasive enough that a reasonable

person would find it hostile or abusive, and the victim must subjectively perceive the work

environment to be abusive." *Littlejohn v. City of New York*, 795 F.3d 297, 321 (2d Cir. 2015)

(quoting *Raspardo v. Carlone*, 770 F.3d 97, 114 (2d Cir. 2014)).  "The incidents complained of

_____

[4] Defendants do not seek dismissal for lack of allegations that might plausibly support imputing conduct to the employer.  The court therefore focuses on the allegations relevant to the "severe or pervasive" inquiry.

must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." *Id.* (quoting *Raspardo*, 770 F.3d at 114).

To determine whether a plaintiff was subjected to a hostile work environment, courts consider "the totality of the circumstances, including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Id.* (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)). "Ultimately, to avoid dismissal under FRCP 12(b)(6), a plaintiff need only plead facts sufficient to support the conclusion that [he] was faced with 'harassment . . . of such quality or quantity that a reasonable employee would find the conditions of her employment altered for the worse . . . .'" *Felton v. Monroe Cmty. Coll.*, 528 F. Supp. 3d 122, 140 (W.D.N.Y. 2021) (second alteration in original; quoting *Patane v. Clark*, 508 F.3d 106, 113 (2d Cir. 2007) (per curiam)). "The Second Circuit has repeatedly cautioned against setting the bar too high in this context." *Id.* (cleaned up).

Here, the Amended Complaint does not include a detailed accounting of the frequency of alleged discriminatory conduct. However, the Amended Complaint does allege that HR found Dr. George's complaints about Dr. Chatta "valid" in 2019. (*See* Doc. 8 ¶¶ 52–55.) Later, after Dr. Chatta resumed a position as Dr. George's immediate supervisor in 2020, Dr. Chatta allegedly increased Dr. George's clinical workload and interfered with Dr. George becoming principal investigator on a prostate study. The allegations also include two separate instances (one in the presence of two other staff members) where Dr. Chatta made comments about Dr. George's skin color, and—drawing inferences in Dr. George's favor—a series of anonymous complaints against Dr. George orchestrated by Dr. Chatta. In Dr. George's view, Dr. Chatta's conduct "detrimentally impact[ed] almost every aspect of and the terms and conditions of his

employment." (Doc. 8 ¶ 116.)  At this early stage of the case—and mindful of the Second

Circuit's caution not to set the bar too high—the court concludes that Dr. George's allegations

support a plausible hostile-work-environment claim.[5]  The court therefore rejects Defendants'

suggestion that the pre-2020 alleged conduct should be excluded from consideration in this case.

## II.    Plausibility of Discrimination Claims (Counts 1–4, 8–9)

The Amended Complaint's discrimination claims appear in Counts 1–4 (Title VII and

NYSHRL race, color, national origin, and religious discrimination claims) and in Count 8

(§ 1981 race discrimination claim) and Count 9 (claim under Buffalo Admin. Code 154-11).

Defendants contend that all of these discrimination claims are implausible because, in their view,

Dr. George "does not allege any adverse employment actions, and there are no inferences of

discrimination."  (Doc. 6-3 at 10; *see also* Doc. 12 at 8; Doc. 16 at 7.)  Plaintiff disagrees,

asserting that Defendants' arguments on those points depend upon "improper inferences drawn

in favor of the Defendants."  (Doc. 9 at 16.)

The parties do not dispute the applicable law.  Claims of religious, race, and national

origin discrimination under Title VII and the NYSHRL are subject to the burden-shifting

framework in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See Hernandez v.*

*Kwiat Eye & Laser Surgery, PLLC*, No. 23-7679, 2024 WL 5116365, at *1 (2d Cir. Dec. 16,

2024) (summary order) (race and national origin); *Owens v. City of N.Y. Dep't of Educ.*, No. 21-

2875, 2022 WL 17844279, at *2 (2d Cir. Dec. 22, 2022) (summary order) (religion).  The same

---

[5] To the extent that Dr. George is claiming a hostile work environment in violation of the
NYSHRL, the court concludes that claim, too, survives the motion to dismiss, particularly
because NYSHRL standard is easier to meet than the Title VII standard.  *See Mitura v. Finco*
*Servs., Inc.*, 712 F. Supp. 3d 442, 452 & n.4 (S.D.N.Y. 2024) (noting that the NYSHRL, as
amended in 2019, eliminates the requirement that harassing or discriminatory conduct be "severe
or pervasive").

burden-shifting framework applies to discrimination claims under § 1981. *Knox v. CRC Mgmt.*

*Co.*, 134 F.4th 39, 47 (2d Cir. 2025). And this court has analyzed claims under Buffalo Admin.

Code 154-11 "in the same manner" as Title VII, NYSHRL, and § 1981 discrimination claims.

*Kaplan v. Multimedia Ent., Inc.*, No. 02-CV-00447, 2005 WL 2837561, at *5 n.5 (W.D.N.Y.

Oct. 27, 2005).

> Under the *McDonnell Douglas* burden-shifting framework:
>
> If the plaintiff can show (1) that she is a member of a protected class; (2) that she was qualified for employment in the position; (3) that she suffered an adverse employment action; and, in addition, has (4) some minimal evidence suggesting an inference that the employer acted with discriminatory motivation, such a showing will raise a temporary "presumption" of discriminatory motivation, shifting the burden of production to the employer and requiring the employer to come forward with its justification for the adverse employment action against the plaintiff.

*Littlejohn v. City of New York*, 795 F.3d 297, 307 (2d Cir. 2015). At the Rule 12(b)(6) stage,

"absent direct evidence of discrimination, what must be plausibly supported by facts alleged in

the complaint is that the plaintiff is a member of a protected class, was qualified, suffered an

adverse employment action, and has at least minimal support for the proposition that the

employer was motivated by discriminatory intent." *Id.* at 311.[6] Defendants challenge the

plausibility of the allegations as to the third and fourth elements of the prima facie case. The

court considers those elements in turn.

### A.    Adverse Employment Action

Defendants assert that Dr. George has not plausibly pleaded that he was subjected to any

"adverse employment action." According to Defendants, the Amended Complaint lacks

---

[6] The Amended Complaint includes allegations that Dr. Chatta commented on Dr. George's skin color in 2020 and in 2022. Plaintiff has not asked the court to analyze those allegations as possible "direct evidence" of discrimination under the four-factor test articulated in *Henry v. Wyeth Pharmaceuticals, Inc.*, 616 F.3d 134, 149 (2d Cir. 2010). The court therefore proceeds to consider the arguments related to *McDonnell Douglas* burden-shifting.

sufficient factual allegations beyond mere "conclusory statements" on this element. (Doc. 6-3 at 11.) In Defendants' view, the only changes to the terms or conditions of Dr. George's employment were actually *promotions*. (*Id.* at 12.) Dr. George maintains that Defendants have "misread[] the allegations in the Complaint." (Doc. 9 at 16.)

The Second Circuit has established the following test for what conduct qualifies as an "adverse employment action":

> A plaintiff sustains an adverse employment action if he or she endures a materially adverse change in the terms and conditions of employment. To be materially adverse a change in working conditions must be more disruptive than a mere inconvenience or an alteration of job responsibilities. A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation.

*Shultz v. Congregation Shearith Israel of City of N.Y.*, 867 F.3d 298, 304 (2d Cir. 2017) (alteration in original; quoting *Galabya v. N.Y. City Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000)). The court agrees that certain allegations in the Amended Complaint relevant to this factor are vague or conclusory. (*See, e.g.*, Doc. 8 ¶ 27 (alleging that Dr. Chatta "was making Plaintiff's life difficult since he came to Roswell").) And the Amended Complaint includes allegations that Dr. George was promoted to full professor and took a leadership role under Dr. Puzanov in November 2020. (Doc. 8 ¶¶ 70–71, 77.) However, Dr. George relies on two categories of specific allegations; the court considers each in turn.

## 1.    Denial of Request to Become Principal Investigator

The Amended Complaint includes allegations that, in spring 2021, Dr. Chatta denied Dr. George's request to become principal investigator for the ARV-766-mCRPC-101 prostate study and designated himself as PI. Dr. George maintains that this was an "adverse employment action" because it prevented him "from publishing a research paper and furthering his academic

pursuits." (Doc. 9 at 16.) Defendants assert that Dr. George's view as to the consequences of not being designated PI is "entirely speculative." (Doc. 12 at 9.) Plaintiff responds that Defendants' position "flies in the face of common sense and is further contradicted by the fact that Dr. Chatta took this important assignment for himself." (Doc. 15 at 7.) Defendants insist that Dr. George's "belief" that denial of the PI position harmed his reputation is insufficient. (Doc. 16 at 9.)

As other courts have held, "[t]he elimination of speculative, potential future opportunities is insufficient to establish an adverse employment action." *Malone v. N.Y. Pressman's Union No. 2*, No. 07 Civ. 9583, 2011 WL 2150551, at *7 (S.D.N.Y. May 31, 2011). Thus, where plaintiffs did not claim eligibility "under the seniority system for any position that actually ever opened," they failed to plead any adverse employment action. *Id.* Other cases provide examples of inadequate speculative future opportunities. *See Woolfolk v. N.Y.C. Dep't of Educ.*, No. 19-CV-3706, 2020 WL 1285835, at *7 (S.D.N.Y. Mar. 18, 2020) ("Plaintiff's allegations about not receiving certain interview offers for future employment are too speculative to constitute an adverse employment action."); *Le v. N.Y. State, Off. of State Comptroller*, No. 16-CV-1517, 2017 WL 3084414, at *7 (N.D.N.Y. July 18, 2017) (allegation that official reprimand would affect future advancement and development was "entirely speculative and cannot suffice as an adverse employment action").

The court concludes that such cases are distinguishable. Here, the Amended Complaint indicates that the PI position was in fact available; Dr. Chatta himself took that position. *Cf. Malone*, 2011 WL 2150551, at *7 (alleged lost position was never actually open). The PI position was significantly more concrete than the speculative lost interview offers for future employment in *Woolfolk* or the future effects of a reprimand in *Le*.

18

Other cases provide more specific guidance with respect to academic faculty members' opportunities to serve as principal investigator. A university's action limiting a visiting professor's ability to serve as PI "on certain projects" was not an adverse employment action but only where "there was no indication that being a principal investigator on those projects was a significant part of his job as a visiting professor." *Thompson v. City of Waco*, 764 F.3d 500, 506 (5th Cir. 2014) (discussing *Mota v. Univ. of Tex. Houston Health Sci. Ctr.*, 261 F.3d 512 (5th Cir. 2001)). Here, Dr. George was a full professor—not a visiting professor—at the time that Dr. Chatta allegedly interfered with the PI position. More importantly, *Mota* was an appeal after a jury verdict, so the court in that case had an evidentiary record on which to determine that being a PI was not a "significant part" of the job in question. Dr. George's case is at a much earlier stage, and the court must consider his allegation that loss of the PI position "tarnished [his] reputation and caused him to lose the opportunity to oversee the clinical results and publish the results, which also negatively affected his standing and goals at Roswell." (Doc. 8 ¶ 91.)

*Annett v. University of Kansas*, 371 F.3d 1233 (10th Cir. 2004), is also instructive. In that case, an adjunct professor argued that "she was blocked from receiving PI status and therefore suffered harm to future employment prospects." *Id.* at 1239. Reviewing the district court's grant of summary judgment for the defendant, the Tenth Circuit remarked that the professor's argument was "not without force." *Id.* But the court ultimately held that "the evidence in the record [did] not support the allegation." *Id.* Again, Dr. George's case is in a different procedural posture; the court is reviewing only the pleadings here, and no evidentiary record has yet been developed. Dr. George may be able to come forward with evidence that Dr. Chatta's denial of Dr. George's request to become PI was particularly harmful to Dr. George and thus rose to the level of an "adverse employment action."

19

Notably, a court ruling on summary judgment held that a university's "failure to approve a research application that could directly lead to a decrease in research salary can be an adverse employment action that affects the terms, benefits, and conditions of employment." *Salami v. N.C. Agr. & Tech. State Univ.*, 394 F. Supp. 2d 696, 722 (M.D.N.C. 2005). In light of the "relaxed" prima facie requirements at this stage of the case, *Littlejohn*, 795 F.3d at 307, the court concludes that Dr. George has plausibly alleged that the denial of his request to become PI was an adverse employment action.

### 2.    Increased Clinical Time

Dr. George also contends that it was an "adverse employment action" for Dr. Chatta to increase Dr. George's clinical workload from 40% to 50% and to deny his request to reduce his clinical workload to 30% or 40%. Initially, as noted above, "[a]n adverse employment action is one which is more disruptive than a mere inconvenience or an alteration of job responsibilities." *Buon v. Spindler*, 65 F.4th 64, 79 (2d Cir. 2023) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 138 (2d Cir. 2003)); *see also, e.g.*, *Henry v. NYC Health & Hosp. Corp.*, 18 F. Supp. 3d 396, 405 (S.D.N.Y. 2014) (same; quoting *Galabya*, 202 F.3d at 640). And while reassignment or transfer to a "less prestigious" position can qualify as an adverse employment action, *Banks v. Gen. Motors, LLC*, 81 F.4th 242, 273 (2d Cir. 2023), Dr. George's allegations about increased clinical time do not indicate that he was "reassigned" to a different position.

The Second Circuit has instructed courts to evaluate "indices . . . unique to a particular situation." *Shultz*, 867 F.3d at 304. The court concludes that, in this context, it is plausible that assigning a heavy clinical workload to a research professor can rise to the level of an adverse employment action. These allegations are more plausible in light of the additional allegations

that Dr. Gopalakrishnan, a less experienced doctor, was assigned a lighter clinical workload. (*See* Doc. 8 ¶ 83.)

The Amended Complaint also includes an allegation that Dr. George's increased clinical time negatively "impacted his bonus." (*Id.* ¶ 79.) Citing *Boyar v. City of New York*, No. 10-cv-65, 2010 WL 4345737, at *3 (S.D.N.Y. Oct. 28, 2010), Defendants assert that "the non-receipt of a discretionary bonus does not constitute a change to the terms or conditions of employment." (Doc. 12 at 9.) Dr. George responds by arguing that "Defendants wish this Court to assume that the bonus was discretionary, which is not the case." (Doc. 15 at 7.) Defendants insist that "[t]he Amended Complaint does not allege that Plaintiff expected a discretionary bonus as a matter of course, or that he was entitled to receive a merit bonus as a result of his performance." (Doc. 16 at 8.) Although the Amended Complaint lacks detail as to the nature of Roswell's bonus structure, at this stage the court must allow Dr. George the benefit of an inference that the increased clinical workload reduced the bonus to which he would otherwise have been entitled.

### B.    Inference of Discrimination

As to the fourth element of the prima facie case, Defendants assert that Dr. George has failed to plausibly allege facts that would support the requisite inference of discrimination. (Doc. 6-3 at 12.) In Defendants' view, Dr. George has failed to identify any similarly situated comparators who were treated more favorably, and Dr. Chatta's remarks about skin color were "stray remarks" insufficient to support the inference. (*Id.* at 13–15.) Dr. George maintains that Dr. Gopalakrishnan is a valid comparator, and that Dr. Chatta's remarks about skin color are similar to the remarks in *Tolbert v. Smith*, 790 F.3d 427 (2d Cir. 2015), which the Second Circuit found sufficient to create an inference of discriminatory intent. (*See* Doc. 9 at 18.) In response to Defendants' reply (Doc. 12), Dr. George asserts that he is not required to identify a similarly

situated comparator, and further asserts that Dr. Chatta's statements were not mere "stray remarks." (Doc. 15 at 9–10.) Defendants disagree in their sur-sur-reply. (*See* Doc. 16 at 9–11.)

The court considers the question of the comparator and of Dr. Chatta's alleged remarks in turn. The court remains mindful that, at this "initial stage of a litigation, the plaintiff's burden is 'minimal'—he need only plausibly allege facts that provide 'at least minimal support for the proposition that the employer was motivated by discriminatory intent.'" *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 86–87 (2d Cir. 2015).

### 1.    Comparator

The court begins with the threshold dispute as to whether Dr. George is required to allege the existence of a comparator to establish an inference of discrimination. "A showing of disparate treatment—that is, a showing that an employer treated plaintiff 'less favorably than a similarly situated employee outside his protected group'—is a recognized method of raising an inference of discrimination for the purposes of making out a prima facie case." *Ruiz v. County. of Rockland*, 609 F.3d 486, 493 (2d Cir. 2010) (quoting *Mandell v. County of Suffolk*, 316 F.3d 368, 379 (2d Cir. 2003)). But identification of such a comparator is not the only method to raise an inference of discrimination. *See Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 468 (2d Cir. 2001) ("[A] showing of disparate treatment, while a common and especially effective method of establishing the inference of discriminatory intent necessary to complete the *prima facie* case, is only one way to discharge that burden.").[7]

---

[7] *See also, e.g., Radwan v. Manuel*, 55 F.4th 101, 132 (2d Cir. 2022) (circumstantial evidence of discriminatory animus can "include[]"—but is not limited to—"showing disparate treatment among similarly situated employees"); *Zhornitsky v. Yale Sch. of Med.*, No. 24-CV-00018, 2024 WL 4880695, at *8 n.6 (D. Conn. Nov. 25, 2024) ("[I]t is not required for a Title VII or Title IX plaintiff to identify a comparator."); *Annunziata v. Int'l Brotherhood of Elec. Workers Loc. Union # 363*, No. 15-CV-03363, at *10 n.4 (S.D.N.Y. May 29, 2018) ("Plaintiffs need not provide valid comparators for their Title VII claim."); *Russell v. Aid to*

Here, Dr. George contends that he has pleaded sufficient facts to raise an inference of discrimination based on Dr. Chatta's November 2020 remarks about Dr. George's skin color and then increasing Dr. George's clinical workload. (Doc. 15 at 8.) The court considers Dr. Chatta's alleged comments in more detail below. But for present purposes, the court concludes that the alleged comments are sufficient to provide the needed "minimal support" to infer racial discrimination as alleged in Counts 1 and 2. *Cf. Zuckerman v. GW Acquisition LLC*, No. 20-CV-8742, 2021 WL 4267815, at *5 (S.D.N.Y. Sept. 20, 2021) (holding that Title VII plaintiff alleged "more than enough" facts to support an inference of discrimination based on numerous offensive comments).

Dr. George's allegations regarding Dr. Gopalakrishnan as a comparator support this conclusion. "[T]he standard for comparing conduct requires a reasonably close resemblance of the facts and circumstances of plaintiff's and comparator's cases, rather than a showing that both cases are identical. In other words, the comparator must be similarly situated to the plaintiff in all material respects." *Radwan v. Manuel*, 55 F.4th 101, 132 (2d Cir. 2022) (alteration in original; internal quotation marks omitted). What constitutes "all material respects" depends on the circumstances of each particular case, but in general "must be judged based on (1) whether the plaintiff and those [s]he maintains were similarly situated were subject to the same workplace standards and (2) whether the conduct for which the employer imposed discipline was of comparable seriousness." *Id.* (quoting *Graham v. Long Island R.R.*, 230 F.3d 34, 40 (2d Cir. 2000)). "Ordinarily, the question whether two employees are similarly situated is a question of fact for the jury." *Id.* (quoting *Mandell*, 316 F.3d 368, 379 (2d Cir. 2003)).

_____

*Developmentally Disabled, Inc.*, No. 12 CV 389, 2013 WL 633573, at *12 (E.D.N.Y. Feb. 20, 2013) ("[I]n the Title VII context the comparator test is just one method by which a plaintiff can establish an inference of discrimination." (internal quotation marks omitted)).

The court is not persuaded that this case is an exception to that ordinary rule. Defendants correctly observe that Dr. George has not alleged that he and Dr. Gopalakrishnan "shared the same supervisor, had the same job titles, shared the same responsibilities, and/or worked in the same department." (Doc. 16 at 10.) But the Amended Complaint does allege that Roswell had a "long-standing practice" under which "all" new faculty members—regardless of supervisor, job title, or department—would start at 50% clinical capacity. (Doc. 8 ¶ 83.) The Amended Complaint further alleges that Dr. Chatta assigned Dr. Gopalakrishnan—a light-skinned new doctor of the Hindu religion—a reduced (40%) clinical workload "[i]n direct contrast" to increasing Dr. George's clinical workload from 40% to 50%. Additional facts may disclose a nondiscriminatory reason for the workload difference, but at this early stage of the case, the court concludes that Dr. George has met his "minimal" burden to plead disparate treatment, including as to the claims of religious discrimination in Counts 3 and 4.

### 2.    Remarks

Defendants argue that the allegations regarding Dr. Chatta's remarks about skin color are mere "stray remarks" and cannot give rise to an inference of discrimination. (Doc. 6-3 at 15.) Dr. George maintains that the Second Circuit rejected the "stray remark" argument in *Tolbert v. Smith*, 790 F.3d 427 (2d Cir. 2015), and that the other allegations—read in the light most favorable to him—support an inference of discrimination. (Doc. 9 at 18–19.) Defendants reply that Second Circuit law still holds that "stray remarks" are insufficient to support an inference of discrimination, and that "Dr. Chatta's alleged two comments simply have no relation to any decisions made regarding the terms and conditions of Plaintiff's employment." (Doc. 12 at 12.)

Regarding the "stray remarks" doctrine, the Second Circuit has recently stated:

> While it is true that the stray remarks of a decisionmaker, without more, cannot prove a claim of employment discrimination, we have held that when other indicia

of discrimination are properly presented, the remarks can no longer be deemed stray, and the jury has a right to conclude that they bear a more ominous significance.

*Banks*, 81 F.4th at 266 (internal quotation marks omitted).  The "stray remarks" doctrine is "by no means dispositive," *id.* (quoting *Rasmy v. Mariott Int'l, Inc.*, 952 F.3d 379, 389 (2d Cir. 2020)), and the Second Circuit has cautioned that the purpose of labeling some remarks as "stray" was to recognize that not all comments pertaining to a protected class are "equally probative of discrimination."  *Id.* at 266–67 (quoting *Tomassi v. Insignia Fin. Grp., Inc.*, 478 F.3d 111, 115 (2d Cir. 2007)).[8]

Courts assessing the probative value of any particular remark consider the following four factors:

> (1) who made the remark (i.e., a decision-maker, a supervisor, or a low-level co-worker); (2) when the remark was made in relation to the employment decision at issue; (3) the content of the remark (i.e., whether a reasonable juror could view the remark as discriminatory); and (4) the context in which the remark was made (i.e., whether it was related to the decision-making process).

*Lenzi v. Systemax, Inc.*, 944 F.3d 97, 112 (2d Cir. 2019) (quoting *Henry v. Wyeth Pharm., Inc.*, 616 F.3d 134, 149 (2d Cir. 2010)).  Here, Dr. Chatta was Dr. George's direct supervisor at the times that he allegedly made the remarks about skin color and vitamin D levels.  The first alleged remark was in November 2020, at around the same time that Dr. Chatta increased Dr. George's clinical workload.  The second alleged remark was in June 2022, a few months after Dr. Chatta allegedly delayed Dr. George's request for OA approval.  Dr. George found both remarks

---

[8] Thus, the district court's characterization of a principal's remarks as "stray" in *Tolbert v. Smith*, 790 F.3d 427 (2d Cir. 2015), was not dispositive on appeal in that case.  The analysis is more nuanced than simply categorizing a remark as "stray" or "not stray."  *See Tomassi*, 478 F.3d at 116 (by describing remarks as "stray," the Second Circuit "did not mean to suggest that remarks should first be categorized either as stray or not stray and then disregarded if they fall into the stray category").  The "stray remarks" phrase is perhaps better seen as a shorthand for when a court concludes that a remark is not probative of discrimination.

"offensive[]" and "discriminatory." (*See* Doc. 8 ¶¶ 76, 124.) The court concludes that a reasonable juror could view the remarks as such, too. The allegations do not indicate any particularly relevant context for either remark, although the court notes that the November 2020 remark was made in the presence of two other employees.

Considering all of these factors, the court concludes that Dr. Chatta's alleged remarks about Dr. George's skin color are sufficiently probative of discrimination to support Dr. George's "minimal" burden at this stage of the case, particularly in the context of the "other indicia" discussed above. *Abdu-Brisson*, 239 F.3d at 468 (quoting *Danzer v. Norden Sys., Inc.*, 151 F.3d 50, 56 (2d Cir. 1998)). The court therefore concludes that Dr. George has alleged sufficient facts to plausibly support the third and fourth elements of his prima facie case for purposes of the discrimination claims in Counts 1–4 and 8–9.

## III.    Plausibility of Retaliation Claims (Counts 5–6, 8–9)

Defendants assert that Dr. George's retaliation claims under Title VII and the NYSHRL —and presumably also the retaliation components of Count 8's § 1981 claim and Count 9's § 154-11 claim[9]—are (A) time-barred, and (B) implausible for lack of any adverse employment action. (Doc. 6-3 at 17.) The court rejects the latter argument for the reasons discussed above: Dr. George has alleged at least two plausible adverse employment actions.[10]

---

[9] Defendants seek dismissal of the retaliation claims "Under Title VII and New York Human Rights Law." (Doc. 6-3 at 16.) Although Defendants do not mention the retaliation components of Counts 8 & 9, they presumably seek dismissal of those claims for the same reasons that they seek dismissal of the retaliation components of Counts 5 & 6.

[10] The plausible adverse employment actions for purposes of the discrimination claims satisfy the distinct test for retaliation. *See Davis-Garett v. Urban Outfitters, Inc.*, 921 F.3d 30, 43–44 (2d Cir. 2019) ("Prior decisions of this Circuit that limit unlawful retaliation to actions that affect the terms and conditions of employment no longer represent the state of the law. Instead, the proper question for a retaliation claim is whether the alleged adverse action to which

As to the timeliness of the retaliation claims, Defendants argue that those claims are barred because the alleged protected activity—Dr. George's 2017 complaint to HR; notifying Ms. Johnson of alleged discrimination in June 2018; and emailing Ms. Johnson in October 2018—all occurred before the September 24, 2020, 300-day "lookback" date. (Doc. 6-3 at 17.) Plaintiff maintains that multiple incidents occurred "in close temporal proximity to Dr. Chatta's regaining supervisory status over Dr. George." (Doc. 9 at 21.)

For retaliation claims under Title VII, "the clock begins to run at the time the adverse employment action occurred—not when the plaintiff engaged in the underlying protected activity." *James v. Countrywide Fin. Corp.*, 849 F. Supp. 2d 296, 310 (E.D.N.Y. 2012). Dr. George's protected activities in 2017 and 2018 are therefore not the events that trigger the limitations clock. Here, as discussed above, at least two alleged adverse employment actions occurred after September 24, 2020. The court therefore rejects Defendants' timeliness challenge to the retaliation claims.

## IV.    Aiding-and-Abetting Claim (Count 7)

Count 7 is an "aiding and abetting" claim against Dr. Chatta individually under N.Y. Exec. Law § 296(6). Liability under § 296(6) "requires an underlying predicate violation of the HRL." *Desius v. BWW Res. LLC*, No. 23-CV-6053, 2023 WL 3746336, at *5 (W.D.N.Y. June 1, 2023). Relying on their arguments for dismissal of Dr. George's other claims, Defendants assert that there is no such predicate (or "primary") violation. (Doc. 6-3 at 18–19.) Because the court has rejected those arguments above, the court also rejects Defendants' argument that Count 7 should be dismissed for lack of a predicate violation.

---

the plaintiff was subjected could well have dissuaded a reasonable employee in his position from complaining of unlawful discrimination." (cleaned up).)

27

## V.    Plausibility of § 1981 Claim (Count 8)

Defendants assert that Dr. George's claims under 42 U.S.C. § 1981 should be dismissed because: (A) Roswell is a public benefit corporation that is immune from such claims; and (B) the Amended Complaint fails to allege racial discrimination for the same reasons that Defendants have argued that it fails to establish a Title VII discrimination claim.  (Doc. 6-3 at 19–20.)  The court rejects the latter argument because the court has already concluded that the Amended Complaint contains sufficient allegations to state a plausible Title VII discrimination claim.

The parties focus on two cases from this District bearing on the immunity question. Defendants rely upon *Zhou v. Roswell Park Cancer Institute Corporation*, No. 19-CV-1200, 2021 WL 4272286, at *4 (W.D.N.Y. Sept. 21, 2021) (Vilardo, J.), for the proposition that "because it is a public hospital created under the New York Public Authorities Law, Roswell Park 'is entitled to the same status . . . as a municipality' with respect to section 1981."  The court in that case dismissed the § 1981 claims against Roswell because municipalities are state actors that "cannot be sued under section 1981."  *Id.* at *3 (citing *Duplan v. City of New York*, 888 F.3d 612, 621 (2d Cir. 2018)).

Dr. George relies upon *Underwood v. Roswell Park Cancer Institute*, No. 15-CV-684, 2017 WL 1593445, at *6 (W.D.N.Y. May 2, 2017) (Geraci, C.J.), in which the court reasoned:

> Given the parties' submissions to date, it appears that determining whether Roswell Park is a state actor for the purpose of punitive damages will be a fact-intensive inquiry.  Therefore, if necessary, the Court will decide that issue at a later stage in the litigation with the benefit of a fully developed record.

Based on that ruling, Dr. George asserts that it would be "more appropriate" to leave the immunity determination "to a later stage in the litigation, after the record has been developed." (Doc. 15 at 12.)  Defendants maintain that the cited reasoning in *Underwood* concerns punitive

damages, not § 1981 liability, and that, in any case, *Zhou* is the "controlling authority" because it was decided more recently than *Underwood*. (Doc. 16 at 15.)

As an initial matter, neither *Zhou* nor *Underwood* is binding in this case. *See Onosamba-Ohindo v. Searls*, 678 F. Supp. 3d 364, 372 (W.D.N.Y. 2023) ("It is well-established that 'the decisions of district courts, even those located within the same district, are not binding on other district courts.'" (quoting *Sharp v. Ally Fin., Inc.*, 328 F. Supp. 3d 81, 97 (W.D.N.Y. 2018))). However, the court agrees that *Underwood* is distinguishable because the analysis in that case concerned the question of immunity from punitive damages under New York law. In contrast, *Zhou* directly addresses the question of Roswell's status as a state actor for purposes of § 1981. The court therefore adopts the reasoning in *Zhou* and will grant Roswell's motion to dismiss the § 1981 claim in Count 8.

## VI.    Punitive Damages (Count 9)

The original complaint sought punitive damages against Dr. Chatta only. (*See* Doc. 1 at 18.) The Amended Complaint—filed after Defendants filed the motion to dismiss—seeks punitive damages, presumably against both defendants. (*See* Doc. 8 at 23.) Addressing that issue in its reply memorandum, Roswell asserts that "numerous courts in this Circuit have found hospitals incorporated as public benefit corporations to be immune from punitive damages." (Doc. 12 at 15.) Dr. George's sur-reply cites *Underwood* in support of his arguments against dismissal of the § 1981 claim, but otherwise does not address punitive damages. (*See* Doc. 15 at 12.) Roswell argues that Dr. George has conceded this point by silence. (Doc. 16 at 15.)

As noted above, *Underwood* discussed the question of immunity from punitive damages under New York law. On this issue, the court follows *Underwood* and concludes that it is prudent to decide the "fact-intensive inquiry" as to whether Roswell is a state actor for purposes

of punitive damages at a later stage of the case. As in *Underwood*: "[I]f necessary, the Court will decide that issue at a later stage in the litigation with the benefit of a fully developed record." *Underwood*, 2017 WL 1593445, at *6.[11]

### Conclusion

Defendants' Motion to Dismiss (Doc. 6) is GRANTED as to the claim under 42 U.S.C. § 1981 in Count 8 but is otherwise DENIED.

Dated this ___ day of August, 2025.

Geoffrey W. Crawford, Judge
United States District Court

---

[11] Deciding that issue was ultimately not necessary in *Underwood* because the parties settled the case.